**SIERRA CLUB, et al.,**
**Plaintiffs, Appellees,**

v.

**SECRETARY OF TRANSPORTATION,**
**et al., Defendants, Appellees,**

**Maine Department of Transportation,**
**Defendant, Appellant.**

**No. 85–1280.**

United States Court of Appeals,
First Circuit.

Argued Aug. 6, 1985.
Decided Dec. 23, 1985.

Cabanne Howard, Asst. Atty. Gen., with whom James E. Tierney, Atty. Gen., Augusta, Me., for State of Me., was on brief for defendant, appellant.

Edward F. Lawson with whom Peter L. Koff, Boston, Mass., was on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant Maine Department of Transportation (Maine DOT) appeals a ruling by the United States District Court for the District of Maine in favor of the Sierra Club, the plaintiff below, holding that the Coast Guard had arbitrarily and capriciously issued a permit for the construction of a "bridge" between Kidder Point, Maine, and Sears Island, Maine. The district court revoked the permit. The Coast Guard, which was also named as a defendant in the suit below, has chosen not to appeal the district court's ruling.

This "bridge," which is part of a plan to develop a marine terminal for containerized cargo on Sears Island and, possibly, an industrial park there, was previously the subject of another lawsuit brought by the Sierra Club, *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir.1985) (*Sierra Club I*). That case challenged the issuance of a construction permit for the "bridge" and marine terminal by the Army Corps of Engineers and the authorization for funding the project by the Federal Highway Administration without the preparation of an Environmental Impact Statement (EIS). In view of the fact that Maine DOT has raised a defense of *res judicata* in the present case based upon the proceedings in *Sierra Club I*, it will be necessary to start with a review of the proceedings in *Sierra Club I*.

In *Sierra Club I*, the Sierra Club named as defendants Secretary of the Army John Marsh for the Army Corps of Engineers and Secretary of Transportation Elizabeth Dole for the Federal Highway Administration. Maine DOT intervened. The defend-

ants and Maine DOT had decided on the basis of several Environmental Assessments that the Sears Island project would not have a significant effect on the environment. The federal agencies each issued a "Finding of No Significant Impact," which permitted federal action to proceed without the preparation of an EIS, and authorized the start of construction. The Sierra Club then filed a complaint on October 17, 1984, charging that the agency findings of no significant impact were arbitrary and capricious and that the decision of the agencies to proceed without an EIS was a violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4332 *et seq.*

On November 12, 1984, discovery in *Sierra Club I* revealed that the Coast Guard and Maine DOT had treated an 1100-foot earth fill causeway as a "bridge" under the General Bridge Act of 1946, 33 U.S.C. § 525(b) (1982), rather than as a "causeway" under § 9 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401 (1982). This circumvented the stricter requirements of the Rivers and Harbors Act. The causeway was transformed into a bridge by including in the plans a small (two-foot diameter) pipe running from one side of the causeway to the other at its midpoint. The General Bridge Act permit had been issued on July 13, 1984. On November 19, 1984, the day *Sierra Club I* was scheduled for final argument on the merits, the Sierra Club sought to amend its complaint to include a count charging the Coast Guard with arbitrary and capricious action under the General Bridge Act and the Rivers and Harbors Act. The district court ruled that since the amendment required the addition of a new party who had not yet been served, the amendment would create delay which would be prejudicial to the defendants. The district court, therefore, denied leave to amend.

Fourteen days later, the Sierra Club filed a separate complaint charging the Coast Guard with arbitrary and capricious action under the General Bridge Act, violation of the Rivers and Harbors Act, and arbitrary and capricious action under NEPA for issuing the permit without an EIS. Maine DOT was also named as a defendant in this suit, the one now before us on appeal, which will be referred to here as *Sierra Club II.*

On January 17, 1985, the district court issued an opinion in *Sierra Club I,* holding that the findings of no significant impact were supported by the record and that there was no violation of NEPA by the Army Corps of Engineers or the Federal Highway Administration in proceeding without an EIS. The Sierra Club appealed.

In the meantime, the Coast Guard and Maine DOT moved to dismiss the complaint in *Sierra Club II* on the grounds that it was barred by *res judicata* and *laches* and that there was no private right of action under § 9 of the Rivers and Harbors Act. The motions were denied to the extent they were based on *res judicata* and *laches,* but the issue of a private right of action was reserved until briefing and argument on the merits of the case. On March 16, 1984, the district court issued a memorandum and order holding that the Sierra Club's challenge was to Coast Guard action under the General Bridge Act and not action under the Rivers and Harbors Act and that the Sierra Club had a right of action under the Administrative Procedure Act, 5 U.S.C. § 702 (1982), to review actions taken by the Coast Guard under the General Bridge Act. The district court then went on to hold that the Coast Guard's issuance of a permit under the General Bridge Act was "arbitrary, capricious, and contrary to law" because the structure in question was definitely a causeway rather than a bridge. The court found that congressional consent would have been necessary had the permit been for a causeway and that, by treating the structure as a bridge rather than a causeway, Maine DOT was able to avoid proving that the consent of Congress had been obtained for the structure. The district court issued an injunction revoking the permit issued by the Coast Guard without addressing the NEPA issues also raised by Sierra Club. This ruling has been appealed by Maine DOT and is the subject of our review in the present case.

Just after oral argument in *Sierra Club II*, we issued an opinion in *Sierra Club I*, finding that the Environmental Assessments relied upon by the agencies had failed to consider the secondary impact of the cargo terminal, *i.e.*, the environmental impacts that would result from the development of an industrial park on the island. This meant that the Findings of No Significant Impact were unsupportable and that the decision to proceed without the preparation of an EIS was a violation of NEPA. The case was remanded to the district court, which had yet to act on it when this appeal was argued. In addition to filing an appeal in *Sierra Club II*, Maine DOT has filed a second application with the Coast Guard asking for a permit to build a causeway from Kidder Point to Sears Island. As a result of this court's decision in *Sierra Club I*, however, the Coast Guard has informed the Sierra Club that it will not take any action on this second application until an EIS is prepared.

We now return to *Sierra Club II* and the issues raised by Maine DOT on appeal. Maine DOT contends that these issues raised by the Sierra Club concerning the Coast Guard permit are merged into the judgment in *Sierra Club I*. These issues cannot be raised here because, had they been timely filed, the Sierra Club could have asserted these claims in *Sierra Club I* and it was only Sierra Club's lack of diligence which caused late discovery of the existence of the "bridge" claims. At the very minimum, Maine DOT argues, the claim that the Coast Guard violated NEPA by issuing a permit without an EIS is barred by the final judgment in *Sierra Club I* concerning precisely that issue in relation to the Army Corps of Engineers and the Federal Highway Administration.

RES JUDICATA

Maine DOT has argued that we should address the *res judicata* consequences of *Sierra Club I* on both the Bridge Act count and the NEPA count in *Sierra Club II*. Our resolution of this case, however, only

requires us to consider whether the Bridge Act count is barred by *res judicata*. The district court began its analysis by considering whether the basic prerequisites of *res judicata* had been met, *i.e.*, finality of judgment, identity of parties, and identity of claim. It stated that the parties were "arguably" identical because Secretary of Transportation Elizabeth Dole had been named in each action and, viewing the claims in *Sierra Club I* and *II* as arising from the same complex of facts, the district court reasoned that the two claims were "arguably" the same. It found, however, that it would be "grossly inequitable and improbable and not in accord with principle ... to hold at this time that res judicata bars the assertion" of the Bridge Act claim because the court itself had refused to allow Sierra Club's motion to add this claim "for procedural grounds, specifically related to the then posture of Sierra I."

Maine DOT argues that the district court erred in finding that the court's refusal to allow amendment in *Sierra Club I* blocked the application of *res judicata* as to those amendments. It suggests that the appropriate test is whether Sierra Club could have discovered by the exercise of reasonable diligence the existence of the Bridge Act claim in time to make a *timely* amendment in *Sierra Club I*.[1] It is Maine DOT's contention that Sierra Club could have discovered the Coast Guard's intention to treat the causeway as a bridge as early as June 28, 1983, had it been following the progress of the permit.

We need not address the question whether Sierra Club could have timely raised the Bridge Act claim in *Sierra Club I* because, at the very least, there is not the necessary identity of claims. Under the approach promulgated by § 24 of the Restatement (Second) of Judgments and recently adopted by this circuit in *Manego v. Orleans Board of Trade*, 773 F.2d 1, 5 (1st Cir.1985), a valid and final judgment in a prior action extinguishes all claims arising out of the same transaction or series of

---

1. Maine DOT does not argue that Sierra Club is barred by laches; indeed, Maine DOT conceded on appeal that Sierra Club's General Bridge Act claims are not barred by laches.

connected transactions which gave rise to the earlier claim. Restatement (Second) of Judgments § 24(1).

> (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Id.* at § 24(2).

■■■■ The district court stated that, arguably, the entire Sears Island project and the administrative proceedings connected with it "can be said to arise from the same complex of facts." But in the circumstances of this case we do not believe that all of the administrative proceedings should be viewed as constituting either a single transaction or a series of connected transactions. *Sierra Club I* was concerned with the issuance of a permit by the Army Corps of Engineers and the authorization of funding by the Federal Highway Administration. *Sierra Club II* concerns the issuance of an entirely separate permit by the Coast Guard. Each action was performed independently of the others according to entirely different sets of regulations and by the staffs of different agencies. Each action can be considered a separate and distinct wrong. *Cf. Isaac v. Schwartz,* 706 F.2d 15, 17 (1st Cir.1984) (*res judicata* barred claim seeking redress for the same wrong). Furthermore, the facts required to show that the Coast Guard improperly issued a permit for a "bridge" rather than a causeway are entirely different from the facts required to show the impropriety of the decision to proceed with the project without preparing an Environmental Impact Statement. A challenge to a specific aspect of a complex project such as this cannot as a general rule be permitted to bar an entirely different challenge to a distinctly different part of the project, especially where the challenged actions were taken by different agencies. Because of the fundamental dis-

similarities between the claims asserted in *Sierra Club I* and *Sierra Club II,* as well as the practical considerations related to case management, it was well within the district court's discretion to deny Sierra Club's motion to amend its complaint in *Sierra Club I.* At the same time, the court was fully justified in concluding that it would not be proper to treat this denial as precluding a second action. *See, e.g., McNellis v. First Federal Savings & Loan Association,* 364 F.2d 251, 256–57 (2d Cir.), *cert. denied,* 385 U.S. 970, 87 S.Ct. 504, 17 L.Ed.2d 434 (1966); *Chicago Freight Car Leasing Co. v. Martin Marietta Corp.,* 66 F.R.D. 400, 404 (N.D.Ill.1975). We, therefore, find no merit in the argument by Maine DOT that Sierra Club is barred from raising this new claim arising out of the Sears Island project.

THE COAST GUARD PERMIT

Upon appeal, Maine DOT neither challenges the Sierra Club's right to seek review of Coast Guard actions under the General Bridge Act nor the district court's finding that the Coast Guard's treatment of the structure as a bridge and not a causeway was "arbitrary and capricious." We shall, therefore, set out the facts relating to decision to treat the causeway as a bridge only to give our opinion the proper factual setting.

The record indicates that as early as September 29, 1982, slightly more than two months prior to the submission to the Coast Guard of Maine DOT's application for a bridge permit, Maine DOT called the Coast Guard to discuss what kind of approval would be required for the Sears Island causeway. At that time, the Coast Guard explained that if the structure was strictly a causeway, Maine DOT would have to apply for congressional approval, but if a bridge was included in the causeway design, a Coast Guard permit would be all that was required. Accordingly, on December 8, 1982, Maine DOT applied for permission to build a bridge from Kidder Point to Sears Island. The detailed plans submitted with the application show an

1100–foot solid fill causeway built up approximately seventeen feet above the existing gravel bar, which was exposed at high tide. At the midpoint of the causeway, the plans show a two-foot diameter pipe which would be submerged at high tide and exposed at low tide. On June 13, 1983, the Chief of the Bridge Branch of the Coast Guard wrote to the Commandant concerning the definition of a bridge and causeway:

Ref: (a) Bridge Administration Manual COMDTINST ML6590.5

1. Paragraph 1–C–2.a of reference (a) defines a bridge as any structure—constructed in such a manner that either the horizontal or vertical clearance, or both may affect the passage of vessels or boats through or under the structure. This statement is considered to mean that a bridge provides some vertical and horizontal clearance at mean high tide. Paragraph 1–C–2.a defines a causeway as a raised road across water—which is constructed in navigable waters or affects navigation, navigable waters and design flood flows. This definition is considered to refer to solid fill structures as all other crossing structures would seem to be included in the definition of a bridge.

2. We are concerned with a solid fill structure which will connect an island to the mainland. The structure would include a 24 inch diameter pipe aligned 90° to the longitudinal centerline of the fill. The invert elevation is mean sea level. Mean high water elevation is 5.0. The pipe would be submerged at each high tide and exposed at each low tide.

3. The pipe would permit some tidal exchange, but would completely block navigation. We are uncertain about the status of the proposed structure as it does not conform to the description of a bridge or a causeway. We request guidance in this matter.

4. A determination that the proposed solid fill structure is a bridge would raise a question. Would the diameter of a pipe ever determine that a solid fill structure is a causeway? If so, which diameter would be the determinant?

On June 28, 1983, the Commandant replied:

Ref: (a) CCGD1 (obr) ltr 16590 dtd 13 June 1983

(b) COMDTINST M16590.5, Bridge Administration Manual

1. In reference (a), you requested clarification of the definitions of bridge and causeway as stated in reference (b) and as they relate to a current proposed project.

2. You are correct to consider any structure which provides an opening to be a bridge. The size of the opening(s) does not alter the structure type. Consider a structure with no opening to be a causeway.

3. We need to determine whether a proposed structure is a bridge or a causeway because of primary authority, paragraph 3–G2.a of reference (b). While a bridge is usually covered under the General Bridge Act of 1946, a causeway must have a specific act of Congress.

4. Issuance of a bridge permit does not depend on whether a structure is a bridge or causeway. It depends on the impacts of the proposed structure on the navigation on that waterway and on the quality of the human environment.

5. The structure you have described in reference (a) is a bridge. Now you must determine whether that structure meets the reasonable needs of navigation on that waterway.

Thereafter, on June 26, 1984, the Bridge Branch of the First Coast Guard District issued Findings of Fact which contained the following description of the structure:

*Description of Proposed Bridge.*

a. The proposed bridge is a 24 inch corrugated aluminum pipe.

b. Legal authority for the proposed project is contained in 33 U.S.C. 525–533.

c. At mean high water the proposed bridge would furnish the following minimum navigation clearances:

Vertical: (zero feet)

Horizontal: (zero feet), normal to the channel.

On July 13, 1984, the Coast Guard issued the following document authorizing the construction of the "bridge":

WHEREAS by Title V of an act of Congress approved August 2, 1946, entitled "General Bridge Act of 1946," as amended (33 U.S.C 525–533), the consent of Congress was granted for the construction, maintenance and operation of bridges and approaches thereto over the navigable waters of the United States;

AND WHEREAS the Secretary of Transportation has delegated the authority of Section 532(b) of that act to the Commandant, U.S. Coast Guard by Section 1.46(c) of Title 49 Code of Federal Regulations;

AND WHEREAS before construction is commenced, the Commandant must approve the location and plans of any such bridge and may impose any specific conditions relating to the construction, maintenance and operation of the structure which he deems necessary in the interest of public navigation; such conditions to have the force of law;

AND WHEREAS the—*STATE OF MAINE*— has submitted for approval the location and plans of a bridge to be constructed across Long Cove at Searsport, Maine;

NOW THEREFORE, This is to certify that the location and plans dated August 1982 are hereby approved by the Commandant.

In addition to finding that the Coast Guard's denomination of the structure as a bridge was arbitrary, the district court also made a number of other rulings:

1) Congress did not give consent to the construction of causeways in the General Bridge Act;

2) Under the Rivers and Harbors Act, the consent of Congress is required for the construction of causeways;

3) Congress did not amend the General Bridge Act to give consent to the construction of causeways through the Department of Transportation Act of 1966, 49 U.S.C. § 1651 *et seq.*

The district court concluded:

Under the Rivers and Harbors Act Congress retains ultimate authority over the construction of causeways in navigable waters, and the Coast Guard may not extend the scope of Congress' consent by defining a causeway as a bridge, as it did in this case.

Because the Coast Guard issuance of a bridge permit under the General Bridge Act for construction of the Sears Island causeway was arbitrary, capricious and contrary to law, plaintiffs are entitled to a judgment so declaring and an injunction revoking the bridge permit issued by the Coast Guard for the construction of the Sears Island causeway.

Maine DOT argues on appeal that the mere fact that the Coast Guard arbitrarily and capriciously treated the causeway as a bridge is not in itself sufficient to sustain the district court's revocation of the permit. According to Maine DOT, the district court's revocation of the permit rests primarily upon its finding that the consent of Congress was required for causeways and that the Coast Guard violated the Rivers and Harbors Act in granting permission for a causeway without such consent. Maine DOT first argues that in making such a finding the district court was essentially enforcing the Rivers and Harbors Act and not the General Bridge Act and that it could not do so because there is no private right of action to enforce the Rivers and Harbors Act. Consequently, even if the Coast Guard was arbitrary and capricious in treating the causeway as a bridge, this is of no legal significance since the court could not reach the issue of whether the Coast Guard allowed the construction of a causeway in violation of § 9 of the Rivers and Harbors Act. As an alternative to this argument, Maine DOT contends that regardless of whether Sierra Club may raise this question, the issuance of the permit was not contrary to law. Maine DOT first points to a proviso in the Rivers and Harbors Act which excepts causeways built

over purely intrastate waters from the consent of Congress requirement:

> However, such structures [as are covered by the Act] may be built under the authority of a legislature of a state across rivers and other waterways the navigable portions of which lie wholly within the limits of a single state, provided the location and plans thereof are submitted to and approved by the Secretary of Transportation or by the [Corps] before construction is commenced.

33 U.S.C. § 401. Maine DOT also argues that the district court erroneously concluded that the Department of Transportation Act of 1966, 49 U.S.C. § 1651 *et seq.*, did not give congressional consent to the construction of causeways.

The arguments of Maine DOT in support of the permit issued by the Coast Guard boil down to a claim that the Coast Guard's treatment of the causeway as a bridge is of no consequence either because the Sierra Club cannot enforce the Rivers and Harbors Act or because if the application is considered as a causeway application it would have been approved anyway. We do not believe that the Coast Guard's arbitrary and capricious treatment of the causeway as a bridge is of no legal consequence. Nor do we find it necessary to become involved in enforcing the Rivers and Harbors Act in order to evaluate the significance of the Coast Guard's action.

Federal regulations governing the administrative procedures to be followed by the Coast Guard in issuing bridge and causeway permits state:

> [an] application for authorization to construct a bridge [or causeway] across navigable waters of the United States must show the name and address of the applicant; the waterway and location of the bridge; citation to the act of Congress or the State legislature authorizing the bridge....

33 C.F.R. § 115.50(a).

> When an application is received, the District Commander verifies the authority for the construction of the bridge.... If the application contains any defects that would prevent issuance of a permit ..., the applicant is notified that the permit cannot be granted and given reasons for this determination.

*Id.* at § 115.60(a). Furthermore, internal regulations of the Coast Guard found in the Coast Guard Bridge Manual, COMDTINST M16591.5 CH–1, § 3–G–2, state:

> [a]pplications for permits are to be made by letter to the District Commander having jurisdiction over the area in which the proposed bridge will be located. ... Accompanying the letter should be:
>
> a. Legislative authority for the bridge. Except for causeways and international bridges, the General Bridge Act of 1946 may be cited as the legislative authority.... A causeway will ... require authorization by a special Act of Congress, unless the waterway lies wholly within the state in which case authorization by the state is sufficient.

Had the permit application been for a causeway, the Coast Guard would have had to consider whether the causeway crossed an intrastate or interstate waterway, whether congressional or state approval was necessary, and whether such approval existed. By treating the causeway as a bridge, the Coast Guard avoided answering those questions. It arbitrarily used a procedure for the approval of bridges to issue a permit for a structure other than a bridge. Even were it to turn out that the Sierra Club has no right of review of actions taken under the Rivers and Harbors Act, a question on which we express no opinion here, this cannot insulate from review an action taken under the General Bridge Act.

By treating the causeway as a bridge and issuing a bridge permit to authorize its construction, the Coast Guard did the equivalent of issuing a license for a wolf by calling it a dog. It is not necessary to know whether a wolf license would have been granted, had it been applied for, to know that the dog license issued is a nullity. Similarly, we need not consider whether a causeway permit would have been

784

granted had it been applied for, a question which would certainly involve us in enforcing the Rivers and Harbors Act. It is enough that we can recognize that the Coast Guard acted arbitrarily and capriciously in processing and issuing the permit as it did. We hold, therefore, that the district court acted properly in revoking the bridge permit.

Furthermore, judicial review of the issue raised by the application of the Rivers and Harbors Act to this permit application is premature. The Coast Guard did not consider these issues in its first permit review and, by failing to appeal the district court decision, has left us without any guidance from the agency with direct responsibility for enforcing the Act. Maine DOT currently has another application pending before the Coast Guard, but this time for a *causeway* from Kidder Point to Sears Island. At the moment, this application is on hold until an EIS for the entire project is issued. It is conceivable that an EIS will result in the cancellation of the entire project, mooting the issues presented for review here. *See, e.g., Arnold v. Panora,* 593 F.2d 161 (1st Cir.1979). If it does not, this second application will give the Coast Guard the opportunity to consider what will be required for the approval of this causeway under the Rivers and Harbors Act. Especially here, where the threshold question concerns the intrastate or interstate character of the waterway being crossed, it is better to "wait until the administrative agency that has special competence in the field has ruled." *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 338, 83 S.Ct. 379, 383, 9 L.Ed.2d 350 (1963).

Our affirmation of the result reached by the district court rests upon a narrower ground than that of the district court. The arbitrary and capricious action of the Coast Guard in allowing Maine DOT to submit an application for a causeway as if it were an application for a bridge and approving such application by itself treating the structure as a bridge is sufficient to justify the revocation of the permit. We see no need, therefore, to make any holdings about what would have been required had the Coast Guard treated the structure as a causeway. Accordingly, we express no opinion as to whether the consent of Congress was required for the approval of causeway construction and whether the Department of Transportation Act of 1966 did or did not provide the necessary congressional approval.

*The revocation of the "bridge" permit is affirmed.*